IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VICTORIA ROSALES, etc., | ) | No. CV-F-05-237 OWW/LJO |
| | ) | |
| | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANTS' |
| Plaintiff, | ) | MOTION FOR SUMMARY JUDGMENT |
| | ) | (Doc. 42) DENYING |
| vs. | ) | PLAINTIFF'S MOTION FOR |
| | ) | SUMMARY ADJUDICATION (Doc. |
| | ) | 50), AND SETTING FURTHER |
| CITY OF BAKERSFIELD, et al., | ) | SCHEDULING CONFERENCE FOR |
| | ) | THURSDAY, JULY 5, 2007 AT |
| | ) | 8:45 A.M. |
| Defendant. | ) | |
| | ) | |
| | ) | |

     Victoria Rosales, individually and as administratrix of the
estate of her son, Gabriel Angel Garcia, has filed a complaint
seeking damages pursuant to 42 U.S.C. § 1983, for negligence and
intentional infliction of emotional distress arising out of
Gabriel's death by shooting by officers of the Bakersfield Police
Department on February 21, 2004.  Defendants are the City of
Bakersfield, the Bakersfield Police Department, Police Chief Eric
Matlock, and police officers Greg Terry, Stephen Kauffman, Ryan

1

1  Newman, Sherman Rooks, and Eric Schimon, all sued in their

2  individual and official capacities jointly and severally.   In

3  pertinent part, the Complaint alleges as a First Claim for

4  Relief, wrongful death in violation of 42 U.S.C. § 1983; as a

5  Second Claim for Relief, a survival action pursuant to Section

6  1983; as a Third Claim for Relief, deprivation of Ms. Rosales'

7  right to familial relationship with Garcia pursuant to Section

8  1983; as a Fourth Claim for Relief, municipal supervisory

9  liability pursuant to Section 1983; as a Seventh Claim for

10  Relief, negligence; and as an Eighth Claim for Relief,

11  intentional infliction of emotional distress.[1]

12       Defendants move for summary judgment or partial summary

13  judgment with respect to the remaining claims for relief.

14  Plaintiff moves for summary adjudication on the ground that the

15  Bakersfield Police Department's use of force policy in effect at

16  the time of the incident failed to comply with established law

17  that deadly force only be used where the suspect poses an

18  immediate threat of serious bodily injury or death and that Chief

19  of Police Matlock was responsible for the adoption and

20  implementation of the use of force policy.[2]

21  ───────────────

22       [1]The Complaint also alleges a Fifth Claim for Relief pursuant
    to 42 U.S.C. § 1985 and a Sixth Claim for Relief pursuant to 42
23  U.S.C. § 1986.   In responding to defendants' motion for summary
    judgment in connection with these causes of action, plaintiff
24  stipulates to the dismissal of these claims.   Consequently,
    defendants' motion is GRANTED with respect to the Fifth and Sixth
25  Claims for Relief.
       [2]Subsequent to filing her opposition to defendants' motion,
26  plaintiff filed a Notice of Errata, purporting to correct
    evidentiary deficiencies in her opposition.   Defendants argued that

A.   <u>Factual Background</u>.[3]

1.   <u>Defendants' Statement of Undisputed Facts</u>.

<u>UMF No. 1</u>.  The defendant officers, except Officer Terry, used their firearms to effectuate the seizure of Mr. Garcia.[4]

<u>UMF No. 2</u>.  Mr. Verdile advised 911, in part, that an unknown individual was knocking and hitting his door, going to stab him, and that this was a hate crime due to Verdile's sex offender status, some of which information was transmitted to dispatch by the 911 operator.

<u>UMF No. 3</u>.  The defendant officers received verbal and/or electronic transmissions via the mobile data terminal from the call dispatcher that: the reporting party, Mr. Verdile, was a resident of the home, that he did not know the suspect, that the suspect was at Mr. Verdile's front door, that the suspect was trying to kick the door in, that the suspect was armed with a

---

the Notice of Errata should not be considered in resolving their motion for summary judgment.  Defendants demonstrated no prejudice to their ability to support their motion for summary judgment. Defendants' request is denied.

Defendants' opposition to plaintiff's motion for summary adjudication argued that plaintiff's motion should be denied because Exhibits 2.2 and 2.3 were not timely filed pursuant to the Scheduling Order.  However, by Order filed on August 1, 2006, plaintiff's ex parte application to permit the filing of these exhibits to her motion was granted.  Defendants' contention that plaintiff's motion should be denied on this ground is now moot.

[3]The Factual Background includes revisions made at oral argument and, where appropriate, notes those facts which are disputed for purposes of summary judgment.

[4]Plaintiff disputes this fact to the extent that she notes that, prior to the killing of Mr. Garcia, Officer Terry used his taser to seize Mr. Garcia.  Because Plaintiff does not contend that the use of the taser was constitutionally excessive, Plaintiff's dispute is immaterial.

1   knife, and that the suspect was threatening to kill Mr. Verdile.

2   **UMF No. 4**.  Mr. Garcia was in possession of a knife in his

3   hand upon arrival of the defendant officers and at the time of

4   the shooting.  The knife had an approximately three-inch blade.

5   **UMF No. 5**.  Officer Terry, who was the first officer to

6   arrive at the scene, instructed Mr. Garcia to drop the knife.

7   Mr. Garcia dropped the knife for a disputed amount of time and

8   then picked up the knife again.  When the other officers arrived

9   at the scene, Mr. Garcia was instructed numerous times over the

10  course of several minutes, by each defendant officer, to drop the

11  knife, retreat from the residence, and lie on the ground.  Mr.

12  Garcia did not comply.

13  **UMF No. 6**.  The defendant officers believed Mr. Garcia

14  exhibited signs of intoxication or mental impairment in the form

15  of a blank stare, deliberate movement, disorientation, and non-

16  compliance with verbal commands.

17  **UMF No. 7**.  After the officers arrived, Mr. Garcia breached

18  Mr. Verdile's front door by a couple of inches with back kicks.

19  **UMF No. 8**.  It is disputed that the defendant officers

20  believed that Mr. Garcia had, and intended to, commit several

21  crimes, including Penal Code § 187 (murder), Penal Code § 12024

22  (assault), Penal Code § 459 (burglary), Penal Code § 148(a)

23  (resisting arrest), Penal Code § 417(c) (brandishing a weapon),

24  Penal Code § 417.8 (drawing or exhibiting a deadly weapon with

25  intent to resist arrest), Penal Code § 663 (attempt), Penal Code

26  § 594 (vandalism or malicious mischief), and Health and Safety

4

Code § 11550 (under the influence of a controlled substance).

**UMF No. 9**.  Mr. Garcia made a noise during the application of the taser.

**UMF No. 10**.  It is disputed whether the defendant officers believed that Mr. Garcia was, in fact, attempting to gain access to Mr. Verdile's residence through the front door.

**UMF No. 11**.  It is disputed whether the defendant officers were unaware if any third-parties aside from Mr. Verdile were present on the premises.

**UMF No. 12**.  The defendant officers were no more than thirty feet from Mr. Garcia at the time of his shooting.

**UMF No. 13**.  Approximately eight minutes elapsed from Officer Terry's arrival at 6:43 p.m. until the shooting at 6:51 p.m.

**UMF No. 14**.  It is disputed whether Officer Terry followed an escalation of force consisting of police presence, show of force in drawing service firearms, verbal commands, use of taser, and intended to await the impending arrival of a ranking officer, canine, and pepper ball gun.

**UMF No. 15**.  Officer Schiavon, in a raised, authoritative tone equal in volume to the verbal commands to Mr. Garcia, advised the remaining officers of his intent to shoot before he fired his weapon.

**UMF No. 16**.  Mr. Garcia withstood multiple taser cycles without dropping the knife.

**UMF No. 17**.  Mr. Verdile was in the backyard at the time of

the shooting.

**UMF No. 18**.  The incident occurred in a residential neighborhood.

**UMF No. 19**.  It is disputed whether it appeared to the defendant officers that Mr. Garcia struggled to resist the effects of the taser by making guttural sounds, including growling, and exerting bodily tension.

**UMF No. 20**.  It is disputed that, as the door was breached, whether Mr. Garcia rotated his body.

**UMF No. 21**.  It is disputed that, as Officer Rooks attempted to subdue Mr. Garcia after the shooting, whether Mr. Garcia retracted his arm beneath his torso.

**UMF No. 22**.  It is disputed whether the defendant officers knew that third-parties were not inside the residence and that Mr. Verdile was in the backyard.

**UMF No. 23**.  When the defendant officers arrived at the scene, they believed that Mr. Verdile was endangered.

**UMF No. 24**.  It is disputed whether the defendant officers believed that Mr. Garcia was attempting to flee by breaching the front door.

**UMF No. 25**.  The defendant officers considered Mr. Garcia's mental instability as a factor in their decision to use force.

**UMF No. 26**.  Plaintiff's expert states in his report that "Officer Terry correctly assessed that the Taser would be the best tool for the situation", during the two minutes between 6:49 and 6:51 p.m.

1  **UMF No. 27**.  The only physical use of force applied to Mr.

2  Garcia by Officer Terry was the taser.

3  **UMF No. 28**.  Officer Terry did not discharge his firearm on

4  Mr. Garcia any time during the incident.

5  **UMF No. 29**.  It is disputed whether, subsequent to the use

6  of the taser, but before the discharge of gunfire, Mr. Garcia

7  remained on his feet, active, and alive.

8  **UMF No. 30**.  It was only after the discharge of gunfire that

9  Mr. Garcia began to bleed and lay motionless on the ground.

10  **UMF No. 31**.  It is disputed whether the defendant officers

11  did not know that case law, if any, precluded the use of deadly

12  force under the circumstances of this case.

13  **UMF No. 32**.  It is disputed whether Plaintiff's Complaint

14  for Damages reveals that Mr. Garcia has not suffered the

15  requisite pecuniary loss under California Code of Civil Procedure

16  § 377.34.

17  **UMF No. 33**.  It is disputed whether the complaint only

18  references "general damages," "pain and suffering," "loss of

19  enjoyment of life," and "hedonic damages."

20  **UMF No. 34**.  It is disputed whether discovery responses

21  submitted by plaintiff indicate the absence of special damages

22  incurred by Mr. Garcia before death, and only reference damages

23  suffered by Plaintiff.

24  **UMF No. 35**.  It is disputed whether the defendant officers

25  believed that Mr. Garcia was continuing to attempt to enter the

26  residence after use of the taser.

7

1   **UMF No. 36**.  **Prior to using their firearms, the defendant**
2   **officers, excluding Officer Terry, exhibited a police presence,**
3   **show of force in drawing service their firearms, verbal commands,**
4   **Officer Terry's use of taser.**

5   **UMF No. 37**.  **It is disputed whether the defendant officers**
6   **intended to await the impending arrival of a pepper ball gun, a**
7   **canine, and a ranking officer, Sergeant Hartschorn, all of which**
8   **were believed to be en route; however, Mr. Garcia breached the**
9   **door prior to their arrival, thereby rendering them unavailable**
10  **at the time of the shooting.**

11  **UMF No. 38**.  **It is disputed whether the defendant officers**
12  **each possessed a subjective, good faith belief that Mr. Garcia**
13  **posed a deadly threat to Mr. Verdile and/or other potential**
14  **occupants of the residence at the time of the shooting.**

15  **UMF Nos. 39, 40, 41, 42 and 43**.  **The respective defendant**
16  **officers received the categories of training provided by the**
17  **Bakersfield Police Department.  These included: mental illness,**
18  **racial profiling, POST/Basic Academy, tactical communication,**
19  **crime prevention overview, altercation patterns, use and**
20  **escalation of force, use of force/taser/arrest control, arrest**
21  **and control/defensive tactics, firearms policy and training, risk**
22  **assessment, drug symptomatology, officer safety, and field**
23  **training.**

24  **UMF No. 44**.  **The defendant officers received training in**
25  **areas of law enforcement, including POST training, field**
26  **training, and ongoing, supplemental in-service training.**

8

**UMF No. 45**.  It is disputed whether the defendant officers undertook the actions on February 21, 2004 predicated upon their training and experience in the defense of others.

**UMF No. 46**.  The City of Bakersfield and Bakersfield Police Department had a policy in place for the investigation of officer-involved shootings.

**UMF No. 47**.  It is disputed whether the defendant officers undertook the actions on February 21, 2004 out of legitimate law enforcement objectives for the defense of others and not out of any subjective belief that they would not be disciplined by their superior officers.[5]

**UMF No. 55**.  Retired Chief Matlock was unaware of the events occurring on February 21, 2004 involving Mr. Garcia until subsequent to the shooting.

**UMF No. 56**.  In undertaking their actions, the defendant officers did not consult retired Chief Matlock at any time prior to the shooting.

**UMF No. 57**.  The defendant officers were given periodic performance evaluations prior to the incident.

**UMF No. 58**.  Retired Chief Matlock maintained a chain of command where each officer within the Bakersfield Police Department was subject to the supervision of superior officers.

**UMF No. 59**.  It is disputed whether the defendant officers undertook the actions on February 21, 2004 out of legitimate law

_____

[5]**UMF 48-54 are immaterial to the resolution of these motions.**

enforcement objectives of the defense of others and not out of any subjective belief that they would not be disciplined by their superior officers.

UMF No. 60.  Prior to the incident on February 21, 2004, neither the City of Bakersfield, Bakersfield Police Department, nor retired Chief Matlock was acquainted with Mr. Garcia, either through personal contacts or reputation, aside from isolated arrests by subordinate officers.[6]

UMF No. 66.  Retired Chief Matlock was physically detached from the actual scene, and was not contacted via radio transmission.

UMF No. 68.  In using force upon Mr. Garcia, defendants' conduct was physically directed at Mr. Garcia, and not any third-parties.

UMF No. 69.  Plaintiff did not sustain any physical injuries from the use of force employed by the defendant officers. Plaintiff was not present during the incident.

UMF No. 70.  All physical contact occurred between the defendant officers and Mr. Garcia, not plaintiff.

UMF No. 71.  In responding to the call, the defendant officers either heard and/or read the messages from dispatch.

UMF No. 72.  The defendant officers believed Mr. Garcia was under the influence of some intoxicant.

_____

[6]UMF Nos. 66-63 and 65 are irrelevant because of plaintiff's concession that defendants are entitled to summary judgment in connection with the Fifth and Sixth Claims for Relief.  UMF No. 64 is redundant.  UMF No. 67 is disregarded as argument.

1    **UMF No. 73**.  Mr. Verdile could hear the impacts to the door

2    from the backyard.

3    **UMF No. 74**.  During the incident, Mr. Garcia was observed by

4    the defendant officers to be located at or near the front door to

5    Mr. Verdile's residence.

6    **UMF No. 75**.  The defendant officers believed that Mr. Garcia

7    did not reside at the residence where the incident occurred.

8    **UMF No. 76**.  It is irrelevant whether the defendant officers

9    were subject to the jurisdiction of internal affairs and its

10   investigative authority prior and subsequent to the incident.[7]

11   **UMF No. 78**.  Plaintiff did not arrive at the scene until

12   after the shooting had occurred.

13   **UMF No. 79**.  Mr. Garcia was striking Mr. Verdile's front

14   door during the incident.

15   **UMF No. 80**.  It is disputed whether Mr. Garcia's rotation of

16   his body was interpreted by the defendant officers as an intent

17   to enter the residence.

18   **UMF No. 81**.  The City of Bakersfield and Bakersfield Police

19   Department investigated the shooting giving rise to the instant

20   lawsuit.

21   **UMF No. 82**.  The City of Bakersfield and Bakersfield Police

22   Department concluded the officers acted in accordance with

23   constitutional standards.

24   _____

25   [7]**UMF No. 77 is irrelevant because of plaintiff's concession
     that defendants are entitled to summary judgment on the Fifth and

26   Sixth Claims for Relief.**

**UMF No. 83**.  It is disputed whether the defendant officers interpreted Mr. Garcia's growling during the application of the taser as defiance.

B.  **Governing Standards**.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id*.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id*.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id*.  The nonmoving party

12

may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id*. The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id*. The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id*.

    C.  <u>Violation of Garcia's Constitutional Rights and/or Qualified Immunity</u>.

        1.  <u>First Claim for Relief - Excessive Force in Violation of Fourth Amendment</u>.

All claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment set forth in *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985). "Determining whether the force used to effectuate a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."

13

1  *Graham*, 490 U.S at 396.  This balancing test entails

2  consideration of the totality of the facts and circumstances in

3  the particular case, including "the severity of the crime at

4  issue, whether the suspect poses an immediate threat to the

5  safety of the officers or others, and whether he is actively

6  resisting arrest or attempting to evade arrest by flight."  *Id*.

7  The most important of these factors is the threat posed by the

8  suspect.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir.

9  2005).  In *Garner*, the Supreme Court explained that, while it is

10 unreasonable to apprehend an unarmed, nondangerous suspect by

11 killing him, "[w]here the officer has probable cause to believe

12 that the suspect poses a threat of serious physical harm, either

13 to the officers or to others, it is not constitutionally

14 unreasonable to prevent escape by using deadly force [and] if the

15 suspect threatens the officer with a weapon or there is probable

16 cause to believe that he has committed a crime involving the

17 infliction or threatened infliction of serious physical harm,

18 deadly force may be used if necessary to prevent escape, and, if,

19 where feasible, some warning has been given."  *Garner*, 471 U.S.

20 at 11-12.  In *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th

21 Cir.1997), *cert. denied*, 522 U.S. 1115 (1998), the Ninth Circuit

22 held:

23            Certain principles are clearly established
           under the cases described above and others
24         that implement the fundamental rules
           regarding the use of deadly force.  Law
25         enforcement officers may not shoot to kill
           unless, at a minimum, the suspect presents an
26         immediate threat to the officer or others, or

> is fleeing and his escape will result in a
> serious threat of injury to persons ...
> Moreover, whenever practicable, a warning
> must be given before deadly force is
> employed.

The "broad discretion that must be afforded to police officers who face a tense situation," must be extended to mistakes of fact concerning "the existence of probable cause" as well as to mistakes as to what the law requires under particular circumstances. *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.  The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397.    The Ninth Circuit has admonished courts to use caution in cases involving the use of deadly force:

> Deadly force cases pose a particularly
> difficult problem under this regime because
> the officer defendant is often the only
> surviving eyewitness.  Therefore, the judge
> must ensure that the officer is not taking
> advantage of the fact that the witness most
> likely to contradict his story - the person
> shot dead - is unable to testify.  The judge
> must carefully examine all the evidence in
> the record, such as medical reports,
> contemporaneous statements by the officer and
> the available physical evidence, as well as
> any expert testimony proffered by the
> plaintiff, to determine whether the officer's
> story is internally consistent and consistent
> with other known facts. In other words, the
> court may not simply accept what may be a
> self-serving account by the police officer.
> It must also look at the circumstantial

1
2
3

> **evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact-finder that the officer acted unreasonably.**

4 *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

5  In arguing that they are entitled to summary judgment that

6 the officers did not violate Mr. Garcia's Fourth Amendment rights

7 when the officers first shot him with the taser and shot and

8 killed him with firearms, defendants place primary reliance on

9 *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005).

10  In *Blanford*, Sheriff's deputies received reports that a man,

11 who turned out to be Blanford, wearing a ski mask and carrying a

12 sword was walking through a residential neighborhood outside

13 Sacramento and behaving erratically.  Two deputies were

14 dispatched to investigate these reports.  During the course of

15 their search for Blanford, the deputies were informed by dispatch

16 that Blanford had been seen licking the sword and that he was

17 walking in the middle of the street.  After driving down several

18 streets where Blanford had been seen, the deputies spotted him

19 walking down Reetey Avenue.  When the deputies arrived, they saw

20 Blanford carrying a 2½ foot long Civil War cavalry saber by the

21 handle.  Blanford was wearing a ski mask that was not covering

22 his face, so that it appeared to be a knit cap pulled down over

23 his ears and close to his eyes.  When the deputies came upon

24 Blanford walking away from their position, they got out of their

25 vehicles, drew their guns, and called out, "Sheriff's Department,

26 stop, drop the sword."  Blanford did not heed this command and

kept walking.  It turned out that Blanford was listening to a
Discman using headphones that were concealed underneath the ski
mask and he did not hear or see the deputies at that time.  The
deputies did not realize until after Blanford was shot that he
had been wearing earphones.  The officers followed Blanford at a
distance of 20 to 25 feet as they were trained to do for persons
with edged weapons.  Their guns were drawn and aimed.  They were
extremely concerned that Blanford posed a significant danger to
any person who might come near him if he turned and charged.  The
deputies continued to shout commands at Blanford to stop and drop
the sword as well as to warn him "We'll shoot."  At the corner,
Blanford stopped, raised the sword, and made a loud growling or
roaring sound.  This increased the deputies' concern that
Blanford posed a risk of physical harm to themselves or others
and considered his action to be a felony of drawing or exhibiting
a weapon with the intent to resist or prevent arrest by a peace
officer in violation of California Penal Code § 417.8.

Blanford then turned onto Gaines Avenue and began angling
his walk toward 8679 Gaines Avenue, which turned out to be his
parents' home where he lived.  The deputies did not know this.
Blanford testified that he first became aware of the deputies'
presence behind him as he was passing his neighbor's house, but
despite his awareness that the deputies might be there for him,
continued walking at the same pace toward his parents' home.  The
deputies considered whether Blanford might be mentally disturbed
or under the influence of narcotics, but believed they had to

secure the weapon before doing anything else in order to protect the public.  As it turned out, Blanford had just taken a dose of antipsychotic medicine for schizophrenia and bipolar disorder for which he was being treated.  Blanford walked up the lawn of his parents' home to the front door, where he searched his pockets for his keys, but realized he did not have them.  He knocked on the door, but no one answered.  Blanford then started walking down the walkway that led in front of the house, past the driveway and garage, and around to the side where there was a gate that led along side the garage to the backyard.  As he turned onto the walkway, Blanford caught a glimpse of the deputies, believed they were police officers, and heard them shout, "Drop the sword".  He did not do so.  Blanford thought he told the deputies that he was going to go put the sword in the back and come up and talk to them afterwards.  Both deputies testified that they never heard any such thing, though even if they had, it would not have alleviated their reasonable concern that Blanford posed an imminent threat as he did not drop the sword.  Neither deputy believed that Blanford should be allowed to get out of sight into the back of the house due to the danger he presented to anyone in the yard or in the house.  Both fired as Blanford rounded the corner of the house to the gate.  Blanford was hit by at least one shot.  Nevertheless, he went through the gate, and it closed behind him.  One of the deputies kicked the gate open and saw Blanford about ten feet away trying to open a door into the garage through which entrance could be

1  gained into the residence.  The deputy ordered him to drop the
2  sword again.  When Blanford did not drop the sword, or stop
3  trying to push the door open, the deputy fired again, hitting
4  Blanford in the right wrist.  The deputy did so out of concern
5  that Blanford would be able to get into the residence and cause
6  death or injury to people inside.  Blanford then turned away,
7  still holding the sword and walked toward the back yard.  The
8  deputy continued firing.  One of the bullets severed Blanford's
9  spine, causing him to fall to the ground and rendering him a
10 paraplegic.

11     The entire encounter lasted about two minutes and
12 approximately fourteen seconds passed between the first and last
13 shots.  Judge Burrell granted summary judgment for the deputies,
14 concluding that the deputies had acted in an objectively
15 reasonable manner in firing each volley, because a reasonable
16 officer in their position at the time would have believed that
17 Blanford presented an imminent threat of death or serious bodily
18 injury to persons inside the house or yard or to themselves.
19 Judge Burrell also granted summary judgment on Blanford's
20 wrongful arrest claim, finding that the deputies had probable
21 cause to arrest Blanford for violating California Penal Code §
22 417.8.  Judge Burrell further held that, even if the deputies'
23 actions violated Blanford's Fourth Amendment rights, the deputies
24 were entitled to qualified immunity because a reasonable officer
25 in their position at the time would not have known that their
26 actions were unlawful.  406 F.3d at 1112-1114.  In affirming

these rulings, the Ninth Circuit ruled:

> Blanford argues that probable cause under *Garner* exists only if the suspect is immediately or directly threatening the officers or others with a weapon, or the suspect recently committed a crime involving the infliction of serious physical harm and deadly force is necessary to prevent escape. He maintains that this standard cannot be met here, because he had not committed a significant crime or threatened anyone, and was walking away from the deputies when they fired the third volley that severely injured him.  As Blanford puts it, officers may not use deadly force 'just in case' a suspect might find someone to harm, yet, he submits, this is what happened to him.
>
> If Blanford were correct that the threat of harm from his conduct was purely hypothetical and could not objectively have been perceived otherwise, then the constitutional limits on use of deadly force would certainly be implicated.  In hindsight, from his point of view, it is understandable to think so.  As it turned out, Blanford did not hear all of the deputies' warnings because he had earphones on.  He was on medication that may have affected his behavior and his judgment. And in fact there was no threat to others because Blanford lived at 8679 Gaines and no one was home at the time.  However, '[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' ... We conclude that from this perspective, the deputies had cause to believe that Blanford posed a serious danger to themselves and to anyone in the house or yard that he was intent on accessing, because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down.

406 F.3d at 1115-1116.  The Ninth Circuit concluded that the first volley was objectively reasonable and that the deputies had probable cause to believe that Blanford posed a threat of serious

physical harm to themselves, or to others, "because he was armed, refused to give up his weapon, was not surrounded, and was trying to get inside a private residence or in default of that, into the back yard, where his sword could inflict injury that the deputies would not then be in a position to prevent."  406 F.3d at 1117-1118.  In so concluding, the Ninth Circuit distinguished three deadly force cases relied upon by Blanford - *Haugen v. Brosseau*, 351 F.3d 372 (9th Cir.2003)(as amended), *rev'd*, 543 U.S. 194 (2004)(reversing on qualified immunity without expressing opinion on the constitutional question); *Harris v. Roderick*, 126 F.3d 1189 (9th Cir.1997); and *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001):

> In *Haugen*, an officer shot a suspect who was trying to flee in his vehicle because she believed he posed a danger to other officers (not to herself) who might be approaching the driveway.  However, the evidence showed that she knew where the other officers would be coming from and would necessarily have known that none was in harm's way.  We found this was objectively unreasonable.  Unlike Officer Brosseau in *Haugen*, the deputies in this case could not have perceived that there was no one in harm's way.  While it is true that the deputies did not know if anyone was at home or in the yard at 8679 Gaines, it was objectively reasonable for them to be concerned for the safety of whoever was there, and for themselves.

> In *Harris*, which arose out of the standoff at Ruby Ridge, an FBI agent shot a suspect who was in an open space returning to a cabin that he had come out of and which agents knew was occupied by his friends.  The agent could see that Harris posed no threat to anyone at the moment, but he fired without warning pursuant to the FBI's special rules of engagement that authorized agents to shoot to

kill any armed adult male regardless of
whether he posed an immediate threat of
serious physical harm to agents or others.
It was clear that this exceeded Fourth
Amendment bounds under *Garner*.  Unlike the
FBI agent in *Harris*, the deputies here knew
that Blanford was armed with an edged sword
that he refused to drop despite orders to do
so and despite warnings that he would be shot
if he did not.  Their concern that he posed a
significant risk of serious harm to anyone
inside the house or yard, and to themselves,
is supported by this evidence and the fact
that he continued to hold the sword while
trying to access a private residence and yard
and with which they were unaware he had any
connection.

Finally, in *Deorle*, officers were called by
Deorle's wife who was concerned that her
husband was out of control.  Thirteen
officers responded, removed the family as
well as neighbors, and surrounded the house
to ensure that Deorle had no avenue of
escape.  Deorle was generally compliant.
After a half-hour or so of observation he
started shouting at the officers while
carrying an unloaded plastic crossbow in one
hand and a bottle of lighter fluid in the
other.  Rutherford told Deorle to drop the
crossbow, which he did.  However, when Deorle
passed a virtual line in the grass that
Rutherford had drawn, Rutherford fired a
'beanbag' round without warning, and without
having told Deorle to stop or to drop the
lighter fluid.  Unlike Officer Rutherford in
*Deorle*, before firing at Blanford the
deputies repeatedly ordered him to stop and
drop the sword, and specifically warned
Blanford that they would shoot unless he did;
unlike Deorle, Blanford was not compliant.
In this case, the deputies only had a few
minutes to act, so there was no time to
remove residents at 8679 Gaines or neighbors
from the area.  Blanford then suggests that
the deputies knew help was on the way and,
like the officers in *Deorle*, should have been
patient.  The difference, however, is that
Blanford had been warned, was noncompliant,
and appeared intent on accessing a private
residence.  The fact that help may have been

1   on the way was immaterial in the
    circumstances of imminent access.  Blanford
2   also suggests that deadly force was
    inappropriate because he, too, appeared
3   emotionally disturbed and should not have
    been treated as if he were a violent criminal
4   who had committed a serious offense.  *See
    Deorle*, 272 F.3d at 1282-83 (indicating that
5   tactics to be used 'against an unarmed,
    emotionally distraught individual who is
6   creating a disturbance or resisting arrest
    are ordinarily different from those involved
7   in law enforcement efforts to subdue an armed
    and dangerous criminal who has recently
8   committed a serious offense').  The deputies
    did factor the possibility of Blanford's
9   being mentally disturbed into their thinking,
    as they should have, but Blanford was armed
10  with a dangerous weapon and it was not
    objectively unreasonable for them to consider
11  that securing the sword was a priority.  *Id.*
    at 1283 (recognizing that there is no per se
12  rule requiring mentally disabled persons to
    be treated differently from 'serious
13  criminals').

14  406 F.3d at 1116-1117.  The Ninth Circuit also ruled that the

15  second and third volleys did not constitute excessive force.

16  With regard to the second volley, the Ninth Circuit held:

17          The second volley was also a reasonable use
            of deadly force under the circumstances
18          because Blanford was still carrying the sword
            and attempting to gain access to the
19          residence.  He was also quite close to the
            deputies.  Nothing else in the balance of
20          factors already present had changed when
            Anderson fired again, and a reasonable
21          officer in his position would have believed
            that doing so was necessary to neutralize the
22          threat Blanford posed to people on the
            premises.
23
    406 F.3d at 1118.  With regard to the third volley, the Ninth
24
    Circuit ruled:
25
            Although Blanford had been hit again in the
26          second volley, he turned away from Anderson

23

and headed toward the yard before the third volley.  On this account, Blanford contends that he was clearly in the deputies' sight and was not escaping, as, for example, was the suspect in *Forrett v. Richardson*, 112 F.3d 416 (9th Cir.1997), *overruled on other grounds by Chroma Lighting v. GTE Prods. Corp.*, 127 F.3d 1136 (9th Cir.1997).  Forrett had committed a violent residential burglary, shot and tied up several victims, escaped in a truck with firearms and ammunition, and eluded police on foot by jumping over fences and crossing residential yards before he was eventually cornered, tried to escape by climbing over a fence, and was shot.  *Forrett* did indeed present a case of extreme escape, but this does not mean that the deputies in this case could not reasonably believe that Blanford, who was armed with a dangerous weapon that he refused to drop and whose conduct manifested a continuing intent to evade their authority and enter a private residence, presented a danger to themselves or others.

Blanford makes the further point that, even if still armed with the sword, he was not holding it in any threatening manner.  He also notes that even so, there was no known person in the vicinity.  These factors, together with the severe injury inflicted, make the third volley the most difficult.  However, from the deputies' position at the time, we cannot say that it was objectively unreasonable for Anderson not to stop firing when Blanford did not stop moving or holding the sword.  All of the facts and circumstances from the beginning of the encounter must be considered.  When they are, the situation confronting Anderson is distinguishable from situations confronting officers in the cases we have already discussed, and from *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir.1991), upon which Blanford also relies on the footing that there, as here, the suspect was shot in the back.  Officers had come to Curnow's house following up on a report from the night before that he was physically threatening a woman.  They shot Curnow once when it looked as if he were slapping a woman, and again

24

> fatally as he tried to leave the house with a
> gun.  We affirmed denial of summary judgment
> in the officers' favor on qualified immunity
> because the evidence, viewed in the light
> most favorable to Curnow, shown that the
> woman was simply sitting on his lap, Curnow
> was doing nothing threatening, and he was
> unarmed at the time he was shot in the back
> the first time; and that Curnow picked up an
> unloaded gun by the muzzle as he tried to
> flee the house and was shot the second time.
> Here, the deputies knew that Blanford had
> committed a crime, albeit not a violent one,
> and was continuing a course of conduct that
> objectively indicated he was not giving up
> the sword that made him a threat to anyone in
> charging range.

**406 F.3d at 1118.**

With regard to Officers Newman, Rooks, Schimon and Kaufmann, defendants argue that the use of deadly force against Mr. Garcia was reasonable in light of the countervailing governmental interests.

a.  <u>Severity of Crime at Issue</u>.

Defendants argue that the undisputed facts demonstrate that the officers had probable cause to believe that Mr. Garcia had or was intending to commit several crimes, some of which were of a violent nature.  Defendants refer to the evidence that Mr. Verdile, who had been identified as a sex offender by a "Megan's Law" flyer distributed by the Bakersfield Police Department in February, 2004, called 911 on February 21, 2004 when Mr. Garcia came to Mr. Verdile's house, knocked on the door, with a knife in his hand.

b.  <u>Immediacy of Threat to Officers and Others</u>.

Defendants argue that this factor weighs in favor of summary

1   judgment.  Defendants refer to evidence that the officers had

2   knowledge of Verdile's 911 call, as transmitted by dispatch, that

3   Verdile did not know Garcia, that Garcia was at Verdile's front

4   door, armed with a knife, and threatening to kill Verdile.  Upon

5   arrival, the officers observed Garcia in possession of a knife,

6   as well as striking the front door with his hand, that Garcia

7   failed to obey commands to drop the knife, retreat from the

8   residence, and lie on the ground, that Garcia growled, which was

9   interpreted by the officers as defiance, that the officers

10  believed that Garcia was attempting to gain access to Verdile's

11  residence through the front door, that Garcia exhibited signs of

12  intoxication or mental impairment, that the officers were unaware

13  if any third-parties were present on the premises apart from

14  Verdile, that the incident took place in a residential

15  neighborhood within an approximately 8 minute time frame, that

16  Officer Schimon advised the other officers in a loud tone of his

17  intent to shoot if Garcia breached the door, which defendants

18  assert constituted an express warning to Garcia, that the

19  officers provided the "functional equivalent" of a warning when

20  they exhausted various uses of force prior to shooting (referring

21  to police presence, drawing of firearms, verbal commands, and use

22  of the taser), thus conveying to Garcia that the incident would

23  culminate in a shooting if he did not desist.[8]  Defendants

24  _____

25  [8]Defendants concede that, if practicable, a police officer
    must issue a warning before using deadly force.  *Garner*, 471 U.S.
    at 11-12.  Citing *Deorle v. Rutherford*, 272 F.3d 1272, 1283-1284
26  (9th Cir. 2001), *cert. denied*, 536 U.S. 958 (2002), defendants argue

essentially admit that they did not expressly tell Garcia that
they would shoot if he did not comply with their commands.
Defendants further point to evidence that they had probable cause
to believe that Garcia posed an imminent threat of serious injury
to Verdile and other possible occupants of the residence.   In so
arguing, defendants point to evidence that they knew Verdile was
in the backyard and that Garcia actually broke the front door
with his kicks, thereby providing Garcia with access to the house
and backyard.

              c.   Resisting/Evading Arrest.

     Defendants argue that this factor weighs in favor of summary
judgment.   They refer to evidence that Garcia failed to obey
repeated commands to drop the knife, retreat from the residence,
and lie on the ground, that Garcia was striking Verdile's front
door with his fists and feet, eventually breaking the door, the
evidence that Garcia appeared to struggle to contest the effects
of the taser, and the evidence that Garcia appeared to the
officers to rotate his body as the front door was broken as if
intending to enter the residence, and the evidence that Garcia
retracted his arm under his torso as Officer Rooks attempted to
subdue him after the shooting.

     Plaintiff argues that defendants have not demonstrated

_____

that the failure to give a warning is merely a factor to be
considered in applying the *Graham* balancing test.   Here, however,
there is evidence that the officers had ample opportunity to
expressly warn Mr. Garcia that they would shoot if he did not obey
their commands.   Furthermore, *Deorle* did not involve the use of
deadly force.

27

entitlement to summary judgment that the use of force was reasonable.  Plaintiff contends that the officers, acting without plan or direction, "escalated a benign situation into a fatal shooting."[9]

It is undisputed by plaintiff that Mr. Verdile advised 911, in part, that an unknown individual was knocking and hitting his door, going to stab him, and that this was a hate crime due to Verdile's sex offender status, some of which was transmitted to dispatch by the 911 operator.  It is also undisputed by plaintiff that the defendant officers received verbal and/or electronic transmissions via the mobile data terminal from the call dispatcher that: the reporting party, Mr. Verdile, was a resident of the home, that he did not know the suspect, that the suspect was at Mr. Verdile's front door, that the suspect was trying to kick the door in, that the suspect was armed with a knife, and that the suspect was threatening to kill Mr. Verdile.  However,

---

[9]There is a suggestion in plaintiff's briefs that defendants are liable because they set the events in motion leading to Garcia's death by distributing Megan's Law flyers regarding Verdile.  The flyer was circulated in Verdile's neighborhood approximately two weeks before the incident.  Verdile testified at his deposition that he was convicted in 1992 in Alameda County for violation of California Penal Code "288a, 288a(b) dash 2", which is lewd and lascivious acts with a person under the age of 14 and oral copulation by a person over the age of 21 with another person who is under the age of 16.  Plaintiff presents no evidence or argument that the release of this flyer by the Bakersfield Police Department violated any of the provisions of California's version of "Megan's Law", California Penal Code §§ 290.4, 290.45, as in effect in February 2004.  Therefore, in the absence of such a showing, plaintiff's intimation that the defendants violated the law by releasing this flyer and that any of the defendants' caused the confrontation between Verdile and Garcia is without merit.

the evidence is disputed concerning the circumstances that existed when the officers arrived at the scene.  Plaintiff refers to evidence that when Officer Terry arrived on the scene, Garcia was simply knocking on Verdile's door and that, when ordered to do so, Garcia dropped the knife, but Officer Terry did not attempt to subdue Garcia at that time.  Although Officer Terry's testimony is that, when he first arrived on the scene, he saw Garcia standing by the front door holding a knife, that Officer Terry remained by his vehicle approximately 40 to 50 feet away, that he told Garcia to drop the knife, which Garcia did, but that Garcia picked the knife up again in under ten seconds.  Officer Terry further testified that he did not approach Garcia on his own knowing that Garcia had a knife at his feet. Plaintiff refers to evidence Officer Terry, as the ranking officer on the scene, should have taken command of the other officers and coordinated their actions, but he did not.

Plaintiff contends that, as a result of Officer Terry's failure to take command, the officers "created a chaotic scene" by yelling orders simultaneously and displaying their weapons. Plaintiff contends that, although Garcia did not threaten the officers in any way, the officers "escalated the scene" by arming themselves with a taser.  Plaintiff asserts that it was only at this point that Garcia began kicking the door.  Plaintiff notes evidence that Garcia went to his knees after being hit with the taser, but the officers did not attempt then to subdue him. Plaintiff argues that evidence suggests that Garcia panicked

after being tased and kicked the door, ultimately loosening the hinges, at which time he was shot and killed.  Plaintiff argues that defendants' claim that Garcia posed a threat to Verdile lacks credibility because of evidence that the officers had been informed that Verdile was in the backyard at the time they fired their weapons.

In *Scott v. Henrich*, *supra,* 39 F.3d  at 915 (9th Cir. 1994), the Ninth Circuit held that even though the officers might have had "less intrusive alternatives available to them," and perhaps under departmental guidelines should have "developed a tactical plan" instead of attempting an immediate seizure, police officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act with that range of conduct we identify as reasonable."   In *Billington v. Smith*, 292 F.3d 1177, 1189-1191 (9th Cir. 2002), the Ninth Circuit held:

> ... [W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force.  In *Alexander [v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994)], the officers allegedly used excessive force because they committed an independent Fourth Amendment violation by entering the man's house to arrest him without an arrest warrant, for a relatively trivial and non- violent offense, and this violation provoked the man to shoot at the officers.  Thus, even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force.

30

*Alexander's* requirement that the provocation be either intentional or reckless must be kept within the Fourth Amendment's objective reasonableness standard. The basis of liability for the subsequent use of force is the initial constitutional violation, which must be established under the Fourth Amendment's reasonableness standard. Thus, if a police officer's conduct provokes a violent response, as in *Duran* [*v. City of Maywood*, 221 F.3d 1127 (9th Cir.2000)], but is objectively reasonable under the Fourth Amendment, the officer cannot be held liable for the consequences of that provocation regardless of the officer's subjective intent or motive. But if an officer's provocative actions are objectively unreasonable under the Fourth Amendment, as in *Alexander*, liability is established, and the question becomes the scope of liability, or what harms the constitutional violation proximately caused.

*Alexander* must be read consistently with the Supreme Court's admonition in *Graham v. Connor* that courts must judge the 'reasonableness of a particular use of force ... from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' That goes for the events leading up to the shooting as well as the shooting. Our precedents do not forbid *any* consideration of events leading up to a shooting. But neither do they permit a plaintiff to establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.

Under *Alexander*, the fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself. The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability. An officer may fail to exercise 'reasonable care' as a matter of tort law yet still be a constitutionally 'reasonable'

31

> officer.  Thus, even if an officer
> negligently *provokes* a violent response, that
> negligent act will not transform an otherwise
> reasonable subsequent use of force into a
> Fourth Amendment violation.

> But if, as in *Alexander*, an officer
> intentionally or recklessly provokes a
> violent response, and the provocation is an
> independent constitutional violation, that
> provocation may render the officer's
> otherwise *reasonable* defensive use of force
> *unreasonable* as a matter of law.  In such a
> case, the officer's initial unconstitutional
> provocation, which arises from intentional or
> reckless conduct rather than mere negligence,
> would proximately cause the subsequent
> application of deadly force.

Defendants argue that plaintiff is attempting to establish

unreasonableness by reference to tactical decisions that might

have obviated the need to use deadly force.  Defendants contend

Garcia was at Verdile's residence in possession of a knife before

any of the officers arrived on the scene.  The officers arrived

on the scene as a result of Verdile's 911 call for police

assistance, Verdile advising the 911 dispatcher that he did not

know Garcia and that Garcia had a knife and was trying to kill

Verdile.  Relying on *Billington*, defendants contend that "any

argument to establish unreasonableness in light of bad tactics,

lesser intrusive means, or 20/20 hindsight must fail in the

absence of unconstitutional conduct."

Defendants' contentions are matters of argument, not

undisputed facts.  Plaintiff has presented evidence from which it

may arguably be inferred that the use of deadly force was

constitutionally unreasonable because defendants did not act to

disarm and subdue Garcia after he was shot with the taser, thereby leading to an unnecessary escalation of the  situation to a point where deadly force was used.

Defendants' motion for summary judgment is DENIED.  The disputed facts set forth above suffice to raise a genuine issue of material fact whether the use of deadly force was excessive within the meaning of the Fourth Amendment.[10]

### 2.  Qualified Immunity.

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has set forth a two-pronged inquiry to resolve all qualified immunity claims.  First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.  However, if the

---

[10]**Defendants move for summary judgment that Officer Terry's use of the taser in an attempt to subdue Garcia and gain his compliance with their orders to drop the weapon and lie down on the ground was a reasonable use of force under the Fourth Amendment.  However, as clarified at oral argument, plaintiff is not contending that the use of the taser itself was excessive force within the meaning of the Fourth Amendment given the opinion of plaintiff's expert that Officer Terry correctly assessed that the taser would be the best tool for the situation.  This motion is GRANTED.**

court determines that the conduct did violate a constitutional right, *Saucier*'s second prong requires the court to determine whether, at the time of the violation, the constitutional right was "clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id.* at 201. Even if the violated right is clearly established, *Saucier* recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faces. If an officer makes a mistake in applying the relevant legal doctrine, he is not precluded from claiming qualified immunity so long as the mistake is reasonable. If "the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense." *Id.* at 205. In *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court reiterated:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier v. Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the sometimes "hazy border between excessive and acceptable force"'). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time

34

did not clearly establish that the officer's
conduct would violate the Constitution, the
officer should not be subject to liability
or, indeed, even the burdens of litigation.

It is important to emphasize that this
inquiry 'must be undertaken in light of the
specific context of the case, not as a broad
general proposition.'  *Id.*, at 201.  As we
previously said in this very context:

> '[T]here is no doubt that *Graham v.
> Connor, supra*, clearly establishes
> the general proposition that use of
> force is contrary to the Fourth
> Amendment if it is excessive under
> objective standards of
> reasonableness.  Yet, that is not
> enough.  Rather, we emphasized in
> *Anderson* [*v. Creighton*] "that the
> right the official is alleged to
> have violated must have been
> 'clearly established' in a more
> particularized, and hence more
> relevant, sense: The contours of
> the right must be sufficiently
> clear that a reasonable officer
> would understand that what he is
> doing violates that right.' ...
> The relevant, dispositive inquiry
> in determining whether a right is
> clearly established is whether it
> would be clear to a reasonable
> officer that his conduct was
> unlawful in the situation he
> confronted.' ...

The Court of Appeals acknowledged this
statement of law, but then proceeded to find
fair warning in the general tests set out in
*Graham* and *Garner* ... In so doing, it was
mistaken.  *Graham* and *Garner,* following the
lead of the Fourth Amendment's text, are cast
at a high level of generality.  See *Graham v.
Connor*, *supra*, at 396 ('"[T]he test of
reasonableness under the Fourth Amendment is
not capable of precise definition or
mechanical application"').  Of course, in an
obvious case, these standards can 'clearly
establish' the answer, even without a body of
relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom. Scarrot v. Wilkins*, 543 U.S. 811 (2004):

> Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.  *See Saucier*, 533 U.S. at 216 ... (Ginsberg, J., concurring)('Of course, if an excessive force claim turns of which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official.').

Defendants argue they are entitled to qualified immunity because the facts in this case are factually similar to those involved in *Blanford, supra,* noting that the Ninth Circuit in *Blanford* held:

> It follows that the deputies are entitled to qualified immunity.  Even if we have misjudged the constitutional issue, neither Supreme Court nor circuit precedent in existence as of November 13, 2000 would have put a reasonable officer in the deputies' position on notice that using deadly force in the particular circumstances would violate his Fourth Amendment rights.  While they certainly would have known from *Garner* and *Graham* that shooting Blanford required probable cause (supported by objectively reasonable facts) to believe that he posed a threat of serious physical harm to themselves or to others, the deputies would not have found fair warning in *Garner, Graham*, or any other Supreme Court or circuit precedent at the time that they could not use deadly force to prevent someone with an edged sword, which they had repeatedly commanded him to drop and whom they had repeatedly warned would otherwise be shot, from accessing a private residence where they or people in the house or yard might be seriously injured.  In this

36

1        they may have been mistaken, but reasonably
         so.
2

3   406 F.3d at 1119.  Defendants assert that "a survey of relevant

4   case authority up to and including February 21, 2004 indicates an

5   absence of law which might place the defendant officers on notice

6   that their conduct, in using their firearms to subdue GARCIA, was

7   unlawful ... The legal precedent set forth in *Deorle, Haugen,* and

8   *Harris* is distinguishable and would not have placed defendants on

9   notice that their conduct was unconstitutional."

10      Plaintiff argues that defendants have not met their burden

11  of demonstrating undisputed material facts entitling them to

12  qualified immunity.  Plaintiff asserts that she has identified

13  the specific right allegedly violated, "Gabriel's right to be

14  free from unreasonable seizures - and the unreasonable use of

15  deadly force - as protected by the Fourth Amendment."  Plaintiff

16  asserts that the "right to be free from the unreasonable use of

17  deadly force unless one poses an immediate threat of death or

18  serious physical bodily injury was 'clearly established' under

19  *Tennessee v. Garner* ... so as to alert a reasonable officer to

20  its constitutional parameters."  Plaintiff asserts that

21  "defendants have not meet [sic] their burden of proving no

22  disputed facts supporting a finding that a reasonable officer

23  could have believed if lawful to shoot and kill Gabriel when he

24  posed no immediate threat of death or serious physical bodily

25  injury."

26      Defendants' motion for summary judgment is DENIED.  The

37

facts material to the objective reasonableness of the defendants'
conduct in using deadly force after the taser, are disputed,
thereby precluding qualified immunity as a matter of law.

D. <u>Survivorship Cause of Action</u>.

The Second Claim for Relief is a survival action pursuant to
42 U.S.C. § 1983.

As explained in *Tatum v. City and County of San Francisco*,
441 F.3d 1090, 1093 n.2 (9th Cir. 2006):

> A claim under 42 U.S.C. § 1983 survives the
> decedent if the claim accrued before the
> decedent's death, and if state law authorizes
> a survival action ... Under California law,
> if any injury giving rise to liability occurs
> before a decedent's death, then the claim
> survives to the decedent's estate. *See*
> Cal.Civ.P. § 377.30.

In moving for summary judgment, defendants refer to
California Code of Civil Procedure § 377.34:

> In an action or proceeding by a decedent's
> personal representative or successor in
> interest on the decedent's cause of action,
> the damages recoverable are limited to the
> loss or damage that the decedent sustained or
> incurred before death, including any
> penalties or punitive or exemplary damages
> that the decedent would have been entitled to
> recover had the decedent lived, and do not
> include damages for pain, suffering, or
> disfigurement.

Defendants argue that Section 377.34 expressly forecloses
recovery of general damages in a survivorship action and limits a
plaintiff to special and punitive damages.  Defendants cite
*County of Los Angeles v. Superior Court*, 21 Cal.4th 292, 304
(1999):

> [U]nder California's survival law, an estate
> can recover not only the deceased plaintiff's
> lost wages, medical expenses, and any other
> pecuniary losses incurred before death, but
> also punitive or exemplary damages.

The Complaint only prays for "general damages", "pain and suffering", "loss of enjoyment of life", and "hedonic damages".[11] Defendants contend that these types of damages are precluded by Section 377.34. Defendants also refer to plaintiff's response to defendants' interrogatory which lists only damages suffered by plaintiff and does not list any damages suffered by Garcia. Defendants further contend, in the absence of special damages, plaintiff may not recover punitive damages because "punitive damages to an estate are available only where compensatory damages have been awarded." *Romo v. Ford Motor Company*, 113 Cal.App.4th 738, 762 n.13 (1995).

Plaintiff argues that defendants are not entitled to summary judgment on the Second Cause of Action. Plaintiff cites *Rufo v. Simpson*, 86 Cal.App.4th 573, 616 (2001), that "[r]elatively minor compensatory damages, such as here the decedents' clothing and personal property damaged during the homicides, can be the springboard for substantial punitive damages." Plaintiff refers

---

[11]**Whether hedonic damages are recoverable in a survivorship action is determined by state law. *Dorn v. Burlington Northern Santa Fe Railroad*, 397 F.3d 1183, 1194 (9th Cir.2005). Hedonic damages are not recoverable in California. Hedonic damages, damages for a decedent's loss of the enjoyment of life, is "a concept foreign to our state survival statute." *Garcia v. Superior Court*, 42 Cal.App.4th 177, 180 (1996); *see also Loth v. Truck-A-Way Corp.*, 60 Cal.App.4th 757, 763-767 (1996). Defendants' motion is GRANTED as to the hedonic damages claim.**

to the Kern County Criminalistics Laboratory Exam Report,
attached as Exhibit 5 to plaintiff's opposition, as demonstrating
that Garcia was fully clothed at the time of his death and
describing the placement of gunshot wounds, several of which must
have penetrated Garcia's clothing.

In reply, defendants argue that the court should not
consider Exhibit 5 for lack of foundation and as inadmissible
hearsay.  However, defendants do not dispute the basic inference
that Garcia was wearing clothes when he was shot and that the
bullets penetrated his clothing.

Defendants' motion for summary judgment on the Second Cause
of Action is DENIED IN PART AND GRANTED IN PART.

E.  <u>Deprivation of Right to Familial Relationship</u>.

The Third Cause of Action is for deprivation of familial
relationship pursuant to 42 U.S.C. § 1983.

1.  <u>Merits of Claim</u>.

Defendants argue that, to prevail on this claim, plaintiff
must prove that the officers knew of and acted with deliberate
indifference to *plaintiff's* rights of familial relationship and
society by using excessive force against Garcia, citing *Byrd v.
Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998).

In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998),[12] the
Supreme Court considered the standard of culpability applicable

---

[12]Defendants cited the Ninth Circuit's opinion in *Lewis v.
County of Sacramento*, 98 F.3d 434 (9th Cir. 1996).  However, the
Ninth Circuit's decision was reversed by the Supreme Court.

to substantive due process claims arising from the unintentional killing of an individual by law enforcement officers during a high-speed automobile chase aimed at apprehending a suspected offender.  The Supreme Court held "that in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation."  *Id*. at 836.  The Supreme Court, noting that the "term 'deliberate indifference' implies ... [that] the standard is sensibly employed only when actual deliberation is practical ...."  523 U.S. at 851.  The Supreme Court compared a high-speed police chase to a prison riot, where the Supreme Court has held that a much higher standard of fault than deliberate indifference has to be shown for officer liability.  *Id*. 852-853.  The Supreme Court held:

> Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other.  Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs.  They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.' ... A police officer deciding whether to give chase must balance on one hand the need to stop a suspect, and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders.
>
> To recognize a substantive due process violation in these circumstances when only

41

midlevel fault has been shown would be to
forget that liability for deliberate
indifference to inmate welfare rests upon the
luxury enjoyed by prison officials of having
time to make unhurried judgments, upon the
chance of repeated reflection, largely
uncomplicated by the pulls of competing
obligations.  When such extended
opportunities to do better are teamed with
protracted failure even to care, indifference
is truly shocking.  But when unforeseen
circumstances demand an officer's instant
judgment, even precipitate recklessness fails
to inch close enough to harmful purpose to
spark the shock that implicates 'the large
concerns of the governors and the governed.'
... Just as a purpose to cause harm is needed
for Eighth Amendment liability in a riot
case, so it ought to be needed for due
process liability in a pursuit case.
Accordingly, we hold that high-speed chases
with no intent to harm suspects physically or
worsen their legal plight do not give rise to
liability under the Fourteenth Amendment
redressible by an action under § 1983.

Id. at 853-854.

In *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d
365 (9th Cir. 1998), the Ninth Circuit addressed a substantive
due process claim brought by parents in a case in which it was
contended that the police officer had inadvertently shot the
wrong man during a gunfight outside a Las Vegas bar.  The Ninth
Circuit, referring to the Supreme Court's holding in *Lewis*,
addressed whether that standard applies in cases where it is
alleged that an officer inadvertently harmed a bystander while
responding to a situation in which the officer was required to
act quickly to prevent an individual from threatening the lives
of others, concluding that it does.  159 F.3d at 372.  The Ninth
Circuit held in pertinent part:

42

This rationale applies with equal force to the circumstances faced by Burns and Pope. When Burns and Pope arrived at the Chances Arr bar, the gunfight in progress threatened the lives of the 50 to 100 people who were trapped in the parking lot.  In other words, Burns and Pope were required to 'act decisively,' 'without the luxury of a second chance' to address a life-threatening situation.  Had Burns and Pope failed to attempt to disable the male in the parking lot when he refused to comply with their commands to stop firing, they would have failed to address the immediate risk of serious harm or death to the many innocent individuals trapped in the parking lot, as well as the threat the combatants posed to themselves.  In such circumstances, the argument for application of the 'purpose to commit harm' standard is even more compelling that it was in *Lewis*, given the stronger parallels that exist with the prison disturbance context from which this standard was drawn.  Indeed, this analogy, which the Supreme Court found 'hard to avoid' with respect to police chases, ... is inescapable in the type of situation addressed here.

This conclusion also is consistent with this circuit's prior precedents and the decisions of other circuits that have applied *Lewis*. In *Byrd* ..., this court addressed the question of whether the substantive due process standard in a claim brought by the mother and widow of an individual killed by law enforcement officers differed from the standard governing a case brought by the estate of an individual killed in a high-speed chase.  Relying on its earlier decision in *Lewis*, this court held that both of these situations are governed by the same degree of culpability ... Though that standard was ultimately rejected by the Supreme Court in *Lewis*, *Byrd* continues to stand for the proposition that the same level of culpability is implicated by these two types of substantive due process claims. Furthermore, each of the circuits that has interpreted and applied this aspect of the *Lewis* decision has recognized that the critical question in determining the

43

appropriate standard of culpability is
whether the circumstances allowed the state
actors time to fully consider the potential
consequences of their conduct.  *See Armstrong
v. Squadrito*, 152 F.3d 564, 578-82 (7th
Cir.1998)(applying *Lewis*'s standard of
culpability reasoning to a substantive due
process claim based on prolonged unlawful
detention); *Medeiros v. O'Connell*, 150 F.3d
164, 169-70 (2nd Cir.1998)(applying *Lewis* in
an accidental shooting case); *Radecki v.
Barela*, 146 F.3d 1227, 1231-32 (10th
Cir.1998)(holding that *Lewis*'s 'purpose to
commit harm' standard applies to all cases
involving emergency situations').

Accordingly, we hold that Las Vegas police
officers Burns and Pope did not violate the
plaintiffs' substantive due process rights to
family association when they accidentally
shot and killed Douglas, because the officers
were responding to the extreme emergency of
public gunfire and did not intend to commit
any harm unrelated to the legitimate use of
force necessary to protect the public and
themselves.

159 F.3d at 372-373.

No published decision involving a substantive due process
claim based on the use of deadly force against a suspect as
opposed to a bystander has been located.  In an unpublished
decision involving such circumstance the Ninth Circuit, citing
*Moreland*, affirmed the grant of summary judgment on a substantive
due process claim brought by the father of the decedent.  *See
Syfu v. Cooke*, 67 Fed.Appx. 404 (9th Cir.2003):

The appellants also did not violate the
appellant's substantive due process rights.
They were responding to a situation that
required them to act quickly, with little
time to deliberate.  The officers' conduct
would be 'conscience-shocking,' and would
constitute a substantive due process
violation, only if they acted with the

44

1
2
3
4

> purpose of causing harm. *See Moreland v. Las Vegas Metro. Police Dep't.*, 159 F.3d 365, 372 (9th Cir.1998). They did not. Rather, the police were faced with a dangerous situation, and the record shows that they acted only with the purpose of protecting themselves and the community. *See id.* at 373.

5   Defendants argue they are entitled to summary judgment with

6   respect to the Third Cause of Action with regard to defendant

7   officers because of the evidence that threats by Garcia to kill

8   Verdile were transmitted by Verdile to 911 and then to the

9   officers by dispatch; that Mr. Garcia was in possession of a

10  knife in his hand at the time of the officers' arrival at the

11  scene and at the time of the shooting; that Garcia was at the

12  front door of Mr. Verdile's residence and kicking and punching at

13  the front door; that Garcia failed to comply with defendants'

14  verbal commands to drop the knife, retreat from the residence,

15  and lie on the ground; that the officers perceived Garcia to be

16  intoxicated; that the officers believed Garcia was continuing to

17  attempt to enter Verdile's residence after the use of the taser;

18  and that Garcia breached Verdile's front door. Defendants refer

19  to the evidence that they engaged in an escalation of force

20  before using deadly force by their physical presence, verbal

21  commands, show of force, and use of the taser. Defendants also

22  refer to evidence that the officers intended to await the arrival

23  of a pepper ball gun, a canine, and a ranking officer, all

24  believed to be en route, but that Garcia breached Verdile's front

25  door prior to their arrival. Defendants argue that this evidence

26  demonstrates that Garcia posed a deadly threat to Verdile or

45

other potential occupants of the residence at the time of the shooting.  Furthermore, because no violation of substantive due process has been demonstrated, the City of Bakersfield, the Bakersfield Police Department, and Chief Matlock are entitled to summary judgment on this cause of action.

Plaintiff contends that defendants are not entitled to summary judgment with respect to this cause of action because defendants "implemented and approved a facially deficient use of force policy" and "trained its police officers under this defective policy."  *See discussion infra*.  In addition, plaintiff asserts, defendants "demonstrated the defectiveness of this policy when they implemented it through their deliberately indifferent tactics."  Plaintiff argues that defendants demonstrated their recklessness by:

> (1) failing to apprehend Gabriel when he initially complied with their request for him to drop his pocketknife, (2) failing to apprehend Gabriel when he subsequently dropped to his knees in response to being tased[,] (3) ultimately shooting and killing Gabriel in the absence of an imminent threat of death or serious bodily injury, and (4) declining to resolve the situation without the unnecessary loss of life.  Defendants then demonstrated an awareness of recklessness by dragging Gabriel's body into the unoccupied home that he had not yet entered.

Whether the officers acted with the deliberate intent to inflict deadly cannot be resolved as a matter of law on this record.  Because the material facts are disputed, defendants' motion for summary judgment is DENIED.

46

1        **2.   Qualified Immunity.**

2        Defendants contend that the individual officers are entitled

3   to qualified immunity.  Because material facts about the

4   reasonableness of the officers conduct and use of deadly force on

5   an allegedly compliant subject who was able to continue conduct

6   that violated the officers commands are in dispute, Defendants'

7   motion for summary judgment on the basis of qualified immunity is

8   DENIED.

9        **F.   Fourth Claim for Relief - Municipal Liability and/or**

10   **Supervisorial Liability.**

11       Defendants move for summary judgment on the issues of

12   municipal liability and supervisorial liability.

13       Plaintiff moves for summary adjudication on the ground that

14   the Bakersfield Police Department's use of force policy in effect

15   at the time of the incident was defective because it failed to

16   comply with established law that deadly force only be used where

17   the suspect poses an immediate threat of serious bodily injury or

18   death and that Chief of Police Matlock was responsible for the

19   adoption and implementation of the use of force policy.  Because

20   this is the only basis upon which plaintiff moves for summary

21   adjudication, this Order discusses the parties' respective

22   positions at this juncture.

23       **1.   Policy or Custom.**[13]

24   _____

25       [13]**Defendants move for summary judgment with regard to claims**
**of failure to train, failure to discipline and ratification because**
**of failure to discipline.  Plaintiff did not respond to these**
26   **grounds for summary judgment.  It is assumed, therefore, that**

47

1    In *Monell v. New York City Dept. of Social Services*, 436

2  U.S. 658, 692 (1978), the Supreme Court limited a local

3  government's liability under Section 1983 to those cases where

4  "some official policy 'causes' an employee to violate another's

5  constitutional rights."

6           [A] local government may not be sued under §
            1983 for an injury inflicted solely by its
7           employees or agents.  Instead, it is when
            execution of a government's policy or custom,
8           whether made by its lawmakers or by those
            whose edicts or acts may fairly be said to
9           represent official policy, inflicts the
            injury that the government as an entity is
10          responsible under § 1983.

11 *Id.* at 694.  Since "Congress did not intend municipalities to be

12 held liable unless action pursuant to official municipal policy

13 of some nature caused a constitutional tort[,] ... a municipality

14 cannot be held liable solely because it employs a tort feasor -

15 or, in other words, a municipality cannot be held liable under §

16 1983 on a respondeat superior theory." *Id.* at 691.  A

17 municipality will be held liable under § 1983 only if "the

18 municipality itself causes the constitutional violation at

19 issue." *Canton v. Harris*, 489 U.S. 378, 385 (1989).  "City

20 policy 'causes' an injury where it is 'the moving force' behind

21 the constitutional violation ... or where 'the city itself is the

22 wrongdoer." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir.1994).

23 However, "[c]ity policy 'need only cause [the] constitutional

24 ─────────────────────────────────────────

25 plaintiff's claims against the City of Bakersfield and Chief
   Matlock are limited to the adoption and implementation of an
   allegedly unconstitutional excessive force policy.  *See discussion*
26 *infra.*

48

violation, it need not be unconstitutional per se.'" *Id.*  As the Ninth Circuit noted in *Chew v. Gates*:

> ... [A]lthough Chew will certainly be free to argue ... that the city policy is unconstitutional on its face, the city would not necessarily escape liability even if it showed that the policy is facially constitutional.  To prevail at trial, Chew need not prove the policy unconstitutional.  Rather he need only show that the *specific use of force* ... violated the Constitution, and that city policy *caused* the unconstitutional application of force in this instance.

*Id.*, at 1444 n.12.

Plaintiff opposes defendants' motion for summary judgment and moves for summary adjudication on the ground that "defendants actually had an affirmative, approved written policy that failed to properly articulate the legal standards regarding the use of deadly force", contending that "[d]espite the established legal standard that deadly force only be used where the suspect poses an *immediate* threat of death or serious bodily injury, the Bakersfield Police Department's use of force policy in effect at the time of the incident failed to include an 'immediacy requirement."

Plaintiff argues that a law enforcement officer has the right to use only such force as is reasonably necessary under the circumstances to make a lawful arrest, citing *Graham v. Connor, supra,* and that the Supreme Court has held in *Tennessee v. Garner, supra*, that a police officer can use deadly force to prevent the escape of a fleeing felon or where he has probable

49

cause to believe that the suspect poses an immediate threat of
death or serious physical harm to the officer or others.
Plaintiff quotes *Tennessee v. Garner*, 471 U.S. at 11: "Where the
suspect poses no immediate threat to the officer and no threat to
others, the harm resulting from failing to apprehend him does not
justify the use of deadly force to do so."  Plaintiff refers to a
letter dated April 12, 2004 to City Attorney Gennaro from the
Chief, Special Litigation Section, Civil Rights Division, United
States Department of Justice, which letter states in pertinent
part:[14]

> • The BPD's use of force policy should
> clearly define when the officers are
> permitted to use force.
>
> The BPD's 'Use and Escalation of Force
> Policy' does not adequately limit officers'
> use of force to those cases in which it is
> required to make a lawful arrest or protect
> an officer or third-party from an immediate
> safety threat.  Appropriately, the BPD
> policy states that officers may use the
> amount of force reasonably necessary 'to gain
> and maintain compliance with the law.'
> However, the policy fails to provide any
> guidance to officers of when force is
> required to 'maintain compliance with the
> law.'  This ambiguity may lead officers to
> believe they are justified in using force in
> situations in which it would be unreasonable.
> For example, BPD officers would not be
> justified in using force to disperse an
> unlawfully assembled crowd without first
> giving the group an opportunity to disperse
> on its own.  A well drafted use of force

---

[14]As discussed above, defendants contend that this letter
should not be considered because of lack of foundation and
relevance.  As to Chief Matlock this appears to be well-taken as
the letter was transmitted in 2004 after Matlock had ceased to
serve as Chief of Police.

policy should give an officer clear guidance
on the type and level of force that is
objectively reasonable in light of the facts
and circumstances confronting him/her in a
given situation.

...

• The BPD should clearly define what type of
force can be used at each level along the
force continuum.

The BPD has a use of force continuum in the
'Use and Escalation of Force Policy,' but
this continuum does not list or define all of
the use of force options that are available
to BPD officers.  It also does not adequately
define the force that can be used in response
to varying levels of resistance from a
subject.  Much of the information regarding
resistance levels and description of the type
of force used by the BPD is contained in a
separate general order entitled 'Suspect
Behavior/Types of Force and Authorized
Restraint Policy.'  We recommend that the BPD
consider consolidating these two general
orders into a comprehensive use of force
continuum.  This consolidation will benefit
the officers because the constitutional
requirements regarding the use of reasonable
force will be conveniently contained in one
general order that they can quickly reference
to ensure compliance with the law.

The current use of force continuum classifies
force levels in three general categories:
Non-Physical/Non-Deadly Force, Physical/Non-
Deadly Force and Physical/Deadly Force.
Under each category, the policy lists force
options available to an officer at the lowest
level of force possible and should only
escalate through each succeeding level of
force after the lower levels of force have
been tried and failed,' there is not an
established hierarchy within the categories
of force.  For example, the policy does not
make any distinction between the use of a
firm grip and the use of a baton, even though
a baton strike can be deadly force.  The
current policy may lead BPD officers to
believe incorrectly that all of the types of

1    force that are listed under each of the three
     categories are of equal gravity and can be
2    used interchangeably.

3    The use of force continuum also does not
     provide any guidance regarding what level of
4    force is appropriate in response to different
     types of resistance.  The failure to match
5    the varying levels of force with the
     corresponding levels of resistance is
6    confusing.  The policy states that '[i]t is
     impossible within the confines of this policy
7    to instruct officers how to react in each and
     every situation where the need to use force
8    may occur.'  This statement is problematic
     and should be removed because it suggests
9    that there are no parameters for an officer
     to follow when the use of force is necessary.
10   When properly designed and implemented, a use
     of force continuum is a fluid and flexible
11   policy guide.  The BPD should utilize the
     suspect behavior descriptions that are
12   included elsewhere in the continuum to
     provide clearer instruction on when an
13   officer should utilize a specific type of
     force.  For example, the policy could
14   instruct officers that control holds/pain
     compliance, which consists of 'grasping the
15   suspect and applying a control hold or pain
     compliance technique' should be used to
16   overcome a suspect who is actively resisting
     (i.e., using hands, arms, legs, or any body
17   part to physically resist arrest).

18   In addition, the continuum fails to recognize
     that certain types of force can fall under
19   more than one of the three general
     categories.  For example, the use of a baton
20   is only categorized as a Physical/Non-Deadly
     type of force, but as discussed above, the
21   baton could constitute Physical/Deadly force.

22   In addition, plaintiff relies on the deposition testimony of

23   Joseph Mullins, training sergeant in the Training Division of the

24   Bakersfield Police Department:

25   Q.  And does it mention anything about
     immediacy or imminence or anything synonymous
26   with those terms?

                              52

A.   No.   I don't see the words 'immediate' or 'imminent' in this policy.

Q.   Or words synonymous with those terms?

A.   Not from my quick review here, sir.

Q.   Besides - are you aware of where else it might reside in the Bakersfield Police Department policies.

A.   No, sir. I'm not.

Q.   Okay.  So other than your recollection, basically you don't recall where it would be if such a requirement existed?

A.   No, sir, I do not.

Q.   Okay.  You agree it does not exist in this particular manual of operations that was in place February of 2004?

A.   I did not see it there, no, sir.

Q.   Okay.  You would agree this was a policy in effect February of 2004?

A.   Yes, sir. [DT 77:1-21]

Defendants set forth the Firearms Policy at issue.  The Firearms Policy lists S.E. Bremmer as Chief of Police and contains the notation "F98-12-17" at the bottom of each page. The Firearms Policy provides in pertinent part:

The purpose of this policy is to set forth guidelines officers should consider when they are faced with circumstances which could cause them to resort to the use of a firearm. Officers are reminded of three (3) basic principles regarding the use of force:

1.   Officers may use only the amount of force reasonably necessary to gain compliance with the law.

2.   Escalation of force should not

53

occur unless lesser levels of force have been exhausted without gaining compliance, or, unless the use of lesser levels of force would risk injury or death, or would obviously be ineffective given the circumstances of the case.

3.  When feasible, some warning should be given.

The guidelines outlined below have been formulated in an effort to assist officers in their decision-making process when confronted with a possible shooting situation where action is critical and there is little time to speculate or reflect on the situation at hand.  No policy can be written to cover every conceivable situation and circumstance. If an officer is compelled to go beyond the guidelines set forth in this policy, that officer must justify his or her actions based on a rational interpretation of the facts and circumstances demanding that action.

1.  An officer may lawfully resort to the use of a firearm when it appears to be reasonably necessary in order to:

A.  protect himself/herself or another person from death or serious physical injury; or

B.  prevent the commission of a crime which threatens death or serious physical injury; or

C.  apprehend a fleeing felon suspect when the officer has probable cause to believe the felony was one which threatened death or serious physical injury and the person's escape would pose a significant threat of death or serious physical injury to the officer or other persons.

2.  If feasible, and if to do so would not increase the danger to the officer or others, a verbal warning commanding the suspect to submit to the authority of the officer shall

54

1    be given prior to the use of deadly force.

2    3.  <u>No</u> officer shall:

3         A.  draw or brandish a weapon
          without sufficient cause.

4
          B.  discharge a firearm solely to
5         disable moving vehicles.

6         C.  discharge a firearm at a
          suspect in a vehicle unless the
7         officer has reasonable belief the
          suspect poses a significant threat
8         of death or serious physical injury
          to the officer or another person.
9         Officers should understand that
          shooting at persons in moving
10        vehicles should only be done under
          the direst of circumstances.  The
11        likelihood of hitting the intended
          target is greatly reduced by the
12        vehicle's metal structure and the
          fact the vehicle is moving.

13
          D.  fire warning shots.
14
          E.  while on duty, carry any weapon
15        or ammunition other than that
          authorized by the Chief of Police
16        or his designee.

17        F.  be without a firearm while in
          public within our own jurisdiction.
18        Exceptions to this would be if it
          were impractical due to the attire
19        worn or if it would be in conflict
          with the best interests of the
20        Bakersfield Police Department due
          to the particular activity the
21        officer is engaged in at the time.

22   When an officer resorts to the use of a
     firearm, it must be with the realization that
23   the death of a person can occur; therefore,
     justification for the use of deadly force
24   must be limited to the facts and
     circumstances known or perceived by the
25   officer at the time he/she is required to
     act.  Facts unknown to an officer, no matter
26   how compelling, cannot later be used to

                         55

justify an officer's actions.

Officers should feel completely justified in their own mind when resorting to the use of firearms, since they are in effect acting on the basis of their training, experience, and expertise.

...

The proceeding policy is based in part upon the following case law decisions:

- <u>Tennessee v. Garner</u> 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) To prevent the escape of a suspected felon, deadly force may not be used unless it's necessary to prevent the escape and the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or others.  When feasible, some warning should be given.

- <u>Graham v. Connor</u>, 109 S.Ct. (1989) [sic] All claims that law enforcement officers have used excessive force (deadly/non-deadly) should be analyzed under the Fourth Amendment and the 'reasonableness' standard. The officers <u>subjective</u> intent has no bearing whether a particular seizure is unreasonable under the Fourth Amendment.  The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene.

- <u>Forrett v. Richardson</u>, 112 F.3d 416 (9th Cir.1997) The Fourth Amendment does not require law enforcement officers to exhaust every alternative before using deadly force.  'Whenever there is probable cause to believe the suspect has committed a crime involving the infliction or

threatened infliction of serious
physical harm, deadly force may be
used if necessary to prevent
escape, if some warning has been
given, where feasible.'

...

Defendants argue that the use of terms "critical", "little time", and "reasonably necessary", when coupled with the citations to *Garner, Graham, and Forrett*, renders the express language of the above-quoted policy constitutional insofar as the policy incorporates by reference the concept of imminence. In addition, defendants refer to the declaration of Joseph Mullins:

5. I have reviewed the language set forth in [*Garner, Graham,* and *Forrett*] and know that they require an imminent threat of death or grave bodily injury to a third-person [sic] prior to the use of deadly force to defend others.

6. Police officers at the Bakersfield Police Department are trained pursuant to the above policies, POST academy, Field Training, and supplemental in-service training.

7. In training police officers of the Bakersfield Police Department relative to the use of deadly force to defend others, the training incorporates the principles of *Graham*, *Garner,* and *Forrett*, and specifically requires all officers to resort to the use of deadly force to defend others only in circumstances where the suspect poses an imminent threat of death or grave bodily injury to the officer or third-parties [sic].

8. In sum, it was on February 21, 2004, and continues to be, the policy of the Bakersfield Police Department to resort to the use of deadly force to defend others only in circumstances where the suspect poses an imminent threat of death or grave bodily injury to third-parties.

57

In addition, the defendant officers aver that "[t]he policy of the Bakersfield Police Department requires that a suspect pose an immediate and imminent threat of death or grave bodily injury prior to the officer or others in using deadly force to defend others."

Plaintiff argues that the Use of Force Policy on its face fails to state the "legal requirement that an *immediate* threat of death or serious physical harm must exist prior to the use of deadly force." Plaintiff contends that the references in the Use of Force Policy to *Garner, Graham* and *Forrett* "clearly reveals that none of the three references contain language which mentions the *immediacy requirement* which is at issue." Plaintiff asserts that defendants' reference to other terms in the Use of Force Policy as equating to the immediacy requirement is unavailing because the term "immediate" is not used. Therefore, plaintiff argues, it is undisputed that the Use of Force Policy fails to contain the legal requirement that an immediate threat of death or serious bodily physical harm must exist prior to the use of deadly force and, therefore, plaintiff is entitled to summary adjudication of this issue.

Although it may have been better had the Firearms Policy at issue used the term "immediate", it is questionable that a policy can be found to be unconstitutional merely because it does not use that specific term. Plaintiff cites no case so holding and independent research disclosed no case. As explained in *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir.2005):

58

> A municipal 'policy' exists when a
> 'deliberate choice to follow a course of
> action is made among various alternatives by
> the official or officials responsible for
> establishing final policy with respect to the
> subject matter in question.'

Further, as discussed above, whether the Firearms Policy is or is not facially unconstitutional is not relevant absent a finding that the Firearms Policy "caused" a violation of Garcia's Fourth Amendment rights.

Because summary judgment for defendants is denied with regard to the alleged use of excessive force, and because causation is a question of fact, defendants' motion for summary judgment and plaintiff's motion for summary adjudication on the issue of municipal liability under *Monell* are DENIED.  This matter may be addressed in limine through expert testimony.  The DOJ communication constitutes criticism of the policy which prevents resolving the issue as a matter of law.

> 2.  <u>Supervisorial Liability</u>.

The parties move for summary judgment or adjudication concerning the liability of defendant retired Chief of Police Eric Matlock.

In a Section 1983 action, *respondeat superior,* or vicarious liability, may not be imposed in the absence of a state law imposing such liability.  *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir.1991), *cert. denied*, 502 U.S. 1074 (1992).  However, "'[a] supervisor may be liable if there exists *either* (1) his or her personal involvement in the constitutional

1   deprivation, *or* (2) a sufficient causal connection between the

2   supervisor's wrongful conduct and the constitutional violation.'"

3   *Id.*  "Supervisory liability exists even without overt personal

4   participation in the offensive act if supervisory officials

5   implement a policy so deficient that the policy 'itself is a

6   repudiation of constitutional rights' and is 'the moving force of

7   the constitutional violation.'"  *Hansen v. Black*, 885 F.2d 642,

8   646 (9th Cir.1989).

9        In moving for summary judgment, plaintiff contends that

10  defendants "have admitted that retired Police Chief Eric Matlock

11  was responsible for the adoption and implementation of a use of

12  force policy that was in effect on February 21, 2004."

13  Plaintiffs refer to an interrogatory served on defendants on July

14  28, 2005, requesting identification of "all individuals known to

15  DEFENDANT who were involved in the implementation of the

16  Bakersfield use of force policy that was in effect on the date of

17  the INCIDENT."  The response was "Chief Eric Matlock, Chief

18  Steven Bremmer, both retired."  Plaintiff also refers to an

19  interrogatory requesting identification of all individuals "who

20  were involved in the adoption of the Bakersfield Police

21  Department use of force policy that was in effect on the date of

22  the INCIDENT."  Again, the response was "Chief Eric Matlock,

23  Chief Steven Bremmer, both retired."

24       Defendants oppose summary adjudication for plaintiff and

25  seek summary judgment in favor of defendant Matlock.  Defendants

26  submit the Declaration of Eric Matlock, who avers in pertinent

60

part that he was the Chief of Police on February 21, 2004, and
further avers:

> 3.  I did not draft the Firearms policy in
> effect at the time of the incident.
>
> 4.  My tenure as Chief of Police ... merely
> coincided with the retention and maintenance
> of the applicable Firearm's policy by the
> Bakersfield Police Department.
>
> 5.  I became the Chief of Police ... on June
> 5, 1999.

Defendants note that Chief Bremmer's name is listed on the
Firearms Policy and that the Firearms Policy sets forth the date
December 17, 1998, approximately seven months before Matlock
became Chief of Police.  Defendants contend:

> In asserting in responses to interrogatories
> that Retired Chief Matlock was involved in
> the implementation and adoption of the
> applicable Firearms policy, defendants stated
> only that Retired Chief Matlock's tenure as
> Chief of Police coincided with the retention
> and maintenance of the applicable policy by
> the Bakersfield Police Department.

Therefore, defendants argue, because defendant Matlock did not
adopt or implement the Firearms Policy at issue, defendants are
entitled to summary judgment and plaintiff's motion must be
denied.

     Plaintiff responds that defendants cannot be allowed to
contradict their discovery responses in an effort to create an
issue of fact.

     In *Foster v. Arenta Assocs., Inc.*, 772 F.2d 1453, 1462 (9th
Cir. 1985) and *Radobenko v. Automated Equipment Corp.*, 520 F.2d
540, 544 (9th Cir. 1973), the Ninth Circuit held that a party

should not be able to substitute an affidavit alleging helpful facts for earlier deposition testimony harmful to its case in order to avoid summary judgment.  This rule applies to conflicts between affidavits and interrogatory responses as well.  *School Dist. No. IJ, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir, 1993).  However, in *Kennedy v. Allied Mut. Ins. Co.* 952 F.2d 262, 266-267 (9th Cir. 1991), the Ninth Circuit held:

> We conclude that the *Foster-Radobenko* rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.  Rather, the *Radobenko* court was concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment.  Therefore, before applying the *Radobenko* sanction, the district court must make a factual determination that the contradiction was actually a 'sham.'

In making this determination, the court should decide whether the actions "were the result of an honest discrepancy, a mistake, or the result of newly discovered evidence."  *Id*. at 267.  Also, if the affiant gives a plausible excuse for the contradiction, the affidavit might not be deemed a sham.  *Jack v. Trans World Airlines, Inc.*, 854 F.Supp. 654, 660 (N.D.Cal.1994).

Defendant Matlock's declaration is not a sham to the extent that he contradicts the interrogatory response that he was involved in the adoption of the Firearms Policy.  The Firearms Policy itself lists Bremmer as the Chief of Police and is dated in late 1998, months before Matlock became the Chief of Police.  The evidence arguably shows that the interrogatory response was

the result of mistake.  However, because the Firearms Policy was in effect during Chief Matlock's tenure as Chief of Police, defendants cannot rely of Matlock's declaration to contradict the discovery response that he implemented the Firearms Policy.  In *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991), the Ninth Circuit, addressing individual capacity liability of the Chief of Police for Los Angeles, stated in pertinent part:

> The district court correctly instructed the jury that it could find Chief Gates liable in his individual capacity if he 'set[] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, when he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury.' ... Supervisory liability is imposed against a supervisory official in his individual capacity for his 'own culpable action or inaction in the training, supervision, or control of his subordinates.' ...; for his '"acquiesce[nce] in the constitutional deprivations of which [the] complaint is made,"' ...; or for conduct that showed a '"reckless or callous indifference to the rights of others."' ....

946 F.2d at 646.  Here, because Matlock was Chief of Police for a number of years after adoption of the Firearms Policy, his failure to revise, after notice, the allegedly constitutionally deficient Firearms Policy to expressly authorize the use of deadly force only when death or serious injury is "imminent" precludes summary judgment in his favor.  However, whether Matlock is liable to plaintiff as a supervisor under the governing standards also presents a question of fact.

Defendants' motion for summary judgment and plaintiff's

motion for summary adjudication on the issue of the supervisory liability of defendant Matlock are DENIED.

G. <u>Seventh Claim for Relief - Negligence</u>.

The Seventh Claim for Relief alleges that "defendants owed Gabriel and Plaintiff a duty of due care, and that duty was breached in that defendants' negligence and failure to exercise due care in shooting and killing Gabriel was the actual and proximate cause of injuries ...."

Defendants move for summary judgment to the extent that this cause of action is based on alleged tactical mistakes, if any, occurring prior to the actual shooting and killing of Garcia.

Defendants cite *Munoz v. City of Union City*, 120 Cal.App.4th 1077 (2004), which in turn discusses *Adams v. City of Fremont*, 68 Cal.App.4th 243 (1998), in which the Court of Appeals held that police did not owe a tort duty to prevent a suicide when responding to an emergency call.

In *Munoz*, the family of a decedent shot and killed by police officer, brought a complaint for damages against the officers, among others, for negligent and intentional wrongful death. The police had responded to a 911 call from decedent's brother who indicated that decedent was hallucinating from drugs she took, was very agitated and holding steak knives. Decedent's father and daughter were in the house with decedent, who was standing at the door talking irrationally. Decedent did not respond to police attempts to calm her and to talk with her, except to tell them to move away from her. An officer shot and killed her when

she moved six inches toward the direction her father and daughter

had gone.  The Court of Appeal held that finding a tort duty and

submitting to the jury the question of whether police tactical

decisions fell below the standard of care was error.  The court

held that its decision in *Adams* "precludes liability based upon

how and when law enforcement personnel respond to requests for

emergency assistance from the public[, but] law enforcement

officers do have a duty to refrain from unreasonable use of

deadly force."  120 Cal.App.4th at 1094.  The court concluded:

> [T]he need to protect the overall safety of
> the community by encouraging law enforcement
> officers to exercise their best judgment in
> deciding how to deal with public safety
> emergencies vastly outweighs the societal
> value of imposing tort liability for the
> judgments they make in emergency situations.
> *Adams* stands for the proposition that law
> enforcement officers are shielded from
> ordinary negligence claims based on their
> response to public safety emergencies when
> those efforts prove to be ineffective in
> preventing self-inflicted harm or harm caused
> by third parties.  Applied to the present
> case, *Adams* means that the conduct of the
> police - Woodward's decisions as to how to
> deploy his officers at the scene, the efforts
> made in an attempt to defuse the situation as
> safely as possible, and other such factors,
> cannot subject appellants to liability.  For
> these reasons, finding a tort duty and
> submitting to the jury the question of
> whether police decisions fell below the
> standard of care, was error.
>
> As in *Adams*, we are not indifferent to
> respondents' concern that insulating law
> enforcement emergency actions from tort
> liability poses the question of whether such
> a shield will discourage police from
> overzealous conduct ... In this regard, we
> find the response we made in *Adams* equally
> applicable here: 'Yet, respondents correctly

65

point out that not imposing a legal duty on
police officers to take reasonable measures
to prevent a threatened suicide
correspondingly diminishes the benefits to
the public gained by requiring law
enforcement personnel to be accountable for
the unreasonable conduct.  While this is so
to some extent, we conclude on balance the
interests to the public in protecting against
future harm and the detrimental consequences
to the public in imposing a tort duty under
such circumstances, outweigh the partial loss
of legal accountability occasioned by a rule
of nonliability.  Moreover, our decision does
not insulate police misconduct from all legal
and internal scrutiny.  Plaintiffs may still
pursue a legal action where police misconduct
constitutes an intentional tort or a
violation of an individual's constitutional
or other federally protected rights. (42
U.S.C. § 1983.)  Furthermore, citizens may
obtain internal review of police conduct by
filing a citizen complaint (Pen.Code, §
832.5), and police officers may be sanctioned
as a result of internal disciplinary
proceedings ... The existence of these other
avenues for redress undercuts the need for
additionally imposing tort liability to deter
police officers from responding to a
threatened suicide in an unreasonable
manner.'   (*Adams*, *supra*, 68 Cal.App.4th at p.
274.)

120 Cal.App.4th at 1097-1098.

Defendants also move for summary judgment to the extent this

claim for relief is based on the shooting and killing of Garcia.

Defendants cite the definition of negligence in CACI 3.10:

Negligence is the doing of something which a
reasonably prudent person would not do, or
the failure to do something which a
reasonably prudent person would do, under
circumstances similar to those shown by the
evidence.

It is the failure to use ordinary or
reasonable care.

66

> Ordinary or reasonable care is that care
> which persons of ordinary prudence would use
> in order to avoid injury to themselves or
> others under circumstances similar to those
> shown by the evidence.

A determination whether police officers were negligent in a shooting death depends upon whether the use of deadly force was reasonable under the standards governing a violation of the excessive force clause of the Fourth Amendment.  *See Munoz, supra*, 120 Cal.App.4th at 1102-1106, citing and discussing United States Supreme Court and other federal authority concerning the standards applicable to a determination of unreasonable or excessive force.

*Munoz* establishes defendants are entitled to summary judgment to the extent that the Seventh Claim for Relief is based on tactical decisions preceding the use of deadly force. Further, defendants' liability for the use of deadly force is determined by Fourth Amendment standards and "negligent acts do not incur constitutional liability", *Billingham v. Smith, supra*, 292 F.3d at 1190.

Defendants' motion for summary judgment with respect to the Seventh Claim for Relief for negligence is GRANTED.

H.   <u>Eighth Claim for Relief - Intentional Infliction of Emotional Distress</u>.

The Eighth Claim for Relief for intentional infliction of emotional distress alleges that "defendants intentionally, wantonly, or in reckless disregard for the consequences to Plaintiff proximately caused Plaintiff to suffer great emotional

trauma by killing her son and by their subsequent failure to properly inform Plaintiff of his demise."

Defendants contend that they are entitled to summary judgment, citing *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1001-1002 (1993), quoting *Christensen v. Superior Court*, 54 Cal.3d 868 (1991):

> 'The elements of the tort of intentional infliction of emotional distress are "'(1) extreme and outrageous by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct ....' Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." ... The defendant must have engaged in "conduct intended to inflict injury or engaged in with the realization that injury would result." ....
>
> In *Christensen*, ... we held that '"[t]he law limits claims of intentional infliction of emotional distress to egregious conduct *toward* plaintiff proximately caused by defendant." ... The only exception to this rule is that recognized when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff ... Where reckless disregard of the plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the outrageous conduct occurs is recognized as the element establishing a higher degree of culpability which, in turn, justifies recover of greater damages by a broader group of plaintiffs than allowed on a negligent infliction of emotional distress theory.' ....
>
> Thus, '[i]t is not enough that the conduct be intentional and outrageous. It must be

conduct *directed at the plaintiff*, or occur
in the presence of a plaintiff *of whom the
defendant is aware.*' ... 'The requirement
that the defendant's conduct be directed
primarily at the plaintiff is a factor which
distinguishes intentional infliction of
emotional distress from the negligent
infliction of such injury.' ....

Defendants contend that plaintiff has no evidence that would
support any conclusion that the shooting of Garcia was directed
at her or that she was present at the scene and that the officers
were aware that she was present at the scene.

Plaintiff responds that there is no requirement that the
plaintiff be present at the scene of the outrageous conduct.

The only authority cited by plaintiff is *Garcia v. County of
Fresno,* 2005 U.S. Dist. LEXIS 31624 (E.D.Cal.2005), which
addressed a motion to dismiss an excessive force case.  The
Complaint alleged that defendants County of Fresno, Fresno County
Sheriff Pierce and Does carried out a policy or custom presumed
that all Mexican males were violent and had to be approached with
the intent to subdue them.  In denying dismissal of the cause of
action for intentional infliction of emotional distress upon the
*decedent*, it was ruled: "In alleging that the Officers
intentionally shot decedent to death, in part because he was
Hispanic, Plaintiffs state a cause of action against the Officers
for intentional infliction of emotional distress."

Here, plaintiff has conceded summary judgment for defendants
with respect to the claims under Sections 1985 and 1986 based on
denial of constitutional rights arising from racial animus.

Further, the claim for intentional infliction of emotional distress in this action is not for emotional distress to Garcia, but to his mother, Victoria Rosales.  Plaintiff's arguments that there is a genuine question of fact that the officers acted outrageously by using unnecessary deadly force and "attempting to cover-up their wrongful act by dragging Gabriel's body into the house to make it appear that he was trying to enter the house" does not suffice to allow *plaintiff* to proceed with this claim.

Plaintiff further contends that defendants' failure to "properly advise Plaintiff" of Garcia's death constitutes intentional infliction of emotional distress.  Plaintiff points to evidence that, even though Garcia was pronounced dead at the scene, defendants failed to inform plaintiff of Garcia's death when officers interviewed her the night of his death and by issuing a press release announcing his death that was ultimately shown to plaintiff by a reporter.  Plaintiff refers to her deposition testimony as follows:

> Q.  Okay.  When you got home, was anybody there?
>
> A.  It was all blocked off, and there was people everywhere, and there was just that yellow rope and policemans [sic] and everybody everywhere.
>
> Q.  Okay.  Did you talk to any police officers that night?
>
> A.  Yes.  They didn't answer me back, though.
>
> Q.  Okay.  When did you find out that Gabriel had been involved in a shooting incident with the police?

1
2
3
4
5
6
7
8
9
10

      A.  Maybe the following day.  That night they
      didn't say anything.  They wouldn't talk to
      me.  I kept saying that my name was Victoria
      Rosales, and I am Gabriel Garcia's mother,
      and they just kept saying there will be an
      officer to go to talk to you.  There will be
      an officer to go to talk to you, and it was
      almost 12 o'clock.

      Q.  At night?

      A.  Yes. [¶] And when they walked in there,
      they didn't say anything, that it was
      Gabriel.  So I don't know.  That is why I
      said I didn't go to talk to them.  I'm not
      sure what was said.  The next day a reporter
      came, and she showed me some paper, and it
      says deceased Gabriel Angel Garcia on there.
      [DT 167]

11    This deposition testimony does not establish that any of

12  individually named defendants had any involvement in interviewing

13  Ms. Rosales or a role in not advising Ms. Rosales that Garcia was

14  dead.  In addition, plaintiff cites no authority from which it

15  may be inferred that any of the defendants named in this action

16  owed a legal duty to plaintiff to advise her of Garcia's death or

17  what the Bakersfield Police Department's protocol is for

18  contacting next of kin.

19    Defendants' motion for summary judgment with respect to the

20  Eighth Claim for Relief is GRANTED.

21                              CONCLUSION

22    For the reasons stated above:

23    1.  Defendants' motion for summary judgment is GRANTED IN

24  PART AND DENIED IN PART.

25    2.  Plaintiff's motion for summary adjudication is DENIED.

26    3.  A scheduling conference shall be held on July 5, 2007 at

                                71

1  **8:45 a.m. to set the trial date.**

2       IT IS SO ORDERED.

3  **Dated:    June 27, 2007          _____/s/ Oliver W. Wanger_____**
                                      UNITED STATES DISTRICT JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26